**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD DiPIETRO,** | : | |
| *INDIVIDUALLY AND ON BEHALF OF HIS* | : | |
| *MINOR CHILD, R.R.D.* | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 22-2106** |
| | : | |
| **ARCHBISHOP WOOD HIGH SCHOOL** | : | |

---

**McHUGH, J.**                                                                   **January 16, 2024**

## MEMORANDUM

This is an action by a former student against a religiously affiliated high school, Archbishop Wood, of alleged mistreatment stemming from "masking" and "social distancing" requirements during the COVID-19 pandemic.  Plaintiff received a medical exemption from the school which allowed him not to wear a mask, but claims the school failed to accommodate him because it required him to maintain an increased "social distance" from others.  He further alleges that the school retaliated against him for his exemption request, and acted negligently by failing to protect him from bullying and harassment by other students and teachers.  Both parties have moved for summary judgment.  I conclude as a matter of law that neither of the federal statutes cited by Plaintiff – the Rehabilitation Act and the Americans with Disabilities Act – applied to Archbishop Wood, and further conclude that no reasonable jury could find the school acted negligently toward Plaintiff.  I will therefore grant the school's motion for summary judgment and dismiss the case.

## I.    Relevant Background

Ronald DiPietro brought this action in May, 2022 on behalf of his minor son, identified as R.R.D.  Because R.R.D. has since turned 18 and the claims at issue relate exclusively to him, I

will reference R.R.D. as the sole plaintiff but continue to use his initials for clarity.  ECF 36, Ex.
B at 5-6 ("R.R.D. Dep.").

R.R.D. is a former student of Defendant Archbishop Wood High School, a private school
affiliated with the Roman Catholic Church.  In September, 2021 – the start of his sophomore year
– Plaintiff sought a medical exemption from the school's requirement that students wear masks to
reduce the spread of COVID-19.  R.R.D. Dep. at 34.  A note by his physician stated that Plaintiff
suffered from "mask induced epistaxis" (*i.e.*, nosebleeds) and recommended "social distancing"
and frequent handwashing as alternative accommodations to wearing a mask.  ECF 36, Ex. J.
Plaintiff's father explained his son's need for an exemption as such: "[M]y son, you know, should
not be wearing a mask cause he's – he's bleeding from the mask and this and that.  He has
asphyxiation, things like that.  He's always getting headaches."  ECF 36, Ex. A at 43 ("DiPietro
Dep.").

Archbishop Wood granted Plaintiff's request.  R.R.D. Dep. at 34; ECF 36, Ex. G at 109
("O'Grady Dep.").  The school denoted R.R.D's exemption by placing a sticker on the back of his
student ID and requiring him to maintain at least six feet of distance from others.  R.R.D. Dep. at
15-16; O'Grady Dep. at 110-11.  Masked students, in comparison, needed to remain only three
feet apart.  R.R.D. Dep. at 60; O'Grady Dep. at 32-33.  The school principal, Cloe O'Grady,
notified Plaintiff's teachers of his exemption and, as a result, Plaintiff's teachers relocated his
desks to the front or back of each of his classrooms to maintain at least six feet of distance.  R.R.D.
Dep. at 16, 118, 206; O'Grady Dep. at 126; DiPietro Dep. at 88-89.

As the only student without a mask, Plaintiff claims that teachers in the hallway would
repeatedly demand his ID for proof of his mask exemption and, on some occasions, a teacher
directed him to sit in the back of the auditorium, considerably farther than six feet from others.

R.R.D. Dep. at 70, 81-82.  He felt harassed by this treatment, and it was his personal belief that six feet of social distancing was medically unnecessary.  *Id.* at 60, 69-84.

Plaintiff's father also repeatedly contacted administrators at Archbishop Wood to express his disagreement with their COVID-19 protocols, especially regarding athletics.  *E.g.*, DiPietro Dep. at 45-46, 56, 127-28; R.R.D. Dep. at 87-88.  But notably, neither Plaintiff, his father, nor his doctor made any specific requests to alter Plaintiff's medical accommodation.[1]  R.R.D. Dep. at 41-42, 95-96; DiPietro Dep. at 45, 65-86, 129-30.

During this same period, Plaintiff experienced ongoing difficulties with a tablemate in the cafeteria.  Plaintiff claims that this student repeatedly bullied him through violent language and threats, although not about his mask exemption or distancing requirement.  R.R.D. Dep. at 97-110, 114, 144, 251-52.  Plaintiff did not notify teachers or administrators about these incidents, *id.* at 108-12, 146-47, until finally, on November 9, 2021, a fistfight broke out between Plaintiff and this student.  *Id.* at 131-42; ECF 36, Ex. D, Incident Reports and Witness Statements.  Both students were suspended and eventually expelled for the fight.  R.R.D. at 158-59, 171-72; O'Grady Dep. at 106; Ex. D (school's final incident report).

Plaintiff – filing this action through his father – claims that his "mask induced epistaxis" constituted a disability that the school failed to accommodate.  He also alleges that the school retaliated against him for requesting an accommodation, by allowing him to face harassment and bullying by teachers and students.  Lastly, he claims that the school acted negligently in failing to protect him from this harassment and bullying.  ECF 16, Am. Compl. ¶¶ 7-15.  Plaintiff brought his initial suit against Archbishop Wood and Principal Cloe O'Grady, but I dismissed the claims

---

[1] The evidence does supply one instance in which Plaintiff's father contacted the school about a teacher who confronted Plaintiff for not wearing a mask.  But this occurred during Plaintiff's freshman year before he requested and received his mask exemption.  DiPietro Dep. at 181.

against O'Grady in November, 2022.  ECF 11.  Plaintiff's remaining claims against Defendant Archbishop Wood assert violations of the Rehabilitation Act, the Americans with Disabilities Act, and common law negligence.

With discovery now complete, both parties move for summary judgment.

**II.      Legal Standard**

Cross-motions for summary judgment are governed by the well-established standard set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

**III.      Discussion**

Plaintiff claims Defendant violated the Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA) by denying him a reasonable accommodation for his disability and retaliating against him for requesting the accommodation.  As explained below, Plaintiff cannot succeed on these claims because neither the RA nor the ADA can be applied to Archbishop Wood. As to Plaintiff's negligence claim, no reasonable jury could conclude that the school breached a duty of care toward Plaintiff.

**A.  The Rehabilitation Act**

Section 504 of the Rehabilitation Act protects individuals with disabilities from discrimination under "any program or activity receiving Federal financial assistance."  29 U.S.C § 794(a).  To prevail on a Section 504 claim, a claimant must prove that he (1) has a disability, (2) sought services from a federally funded entity, (3) was otherwise qualified to receive those services, and (4) was denied those services because of his disability.  *Chambers v. Sch. Dist. Of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d. Cir. 2009).  The RA does not define "Federal financial assistance."

Plaintiff argues that the RA applies here because Defendant received "federal financial assistance" in the form of a Paycheck Protection Program (PPP) loan.  Am. Compl. ¶¶ 53-54; ECF 37, Pl. Summ. J. Br. at 5-6.  The Paycheck Protection Program offered U.S. government-backed loans to employers during the COVID-19 pandemic, primarily to avoid mass layoffs as the economy slowed.  *See* U.S. Dep't of the Treasury, *Paycheck Protection Program*.[2]  The school disputes that PPP loans constitute "Federal financial assistance" under the RA, further arguing that even if it did, such assistance ended once the government forgave its PPP loan, which occurred before the alleged RA violations.  ECF 36, Def. Summ. J. Br. at 14-20.

Few courts have considered the RA's application to PPP loans, and those who have are split.[3]  None dispute, however, that even if a PPP loan created obligations under the RA, those obligations would cease when the government forgives the loan.  Here, because the government forgave Defendant's loan before the alleged RA violations occurred, Plaintiff cannot succeed on an RA claim against Defendant.

Within the Third Circuit, the Rehabilitation Act "applies only during the periods during which the [federal] funds are accepted."  *Koslow v. Pennsylvania*, 302 F.3d 161, 166 n.3 (3d Cir. 2002); *accord Taibi v. Borough of Slatington*, No. 18-00385, 2018 WL 6173366, at *5 (E.D. Pa. Nov. 26, 2018).  If the school's PPP loan constituted "Federal financial assistance," any "acceptance" of that assistance ended when the government forgave the loan.  This is especially

---

[2] Available at https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program [https://perma.cc/DKF9-VEZ8].

[3] *Compare Ariza v. S. Moon Sales, Inc.*, No. 21-23604, 2022 WL 4345136, at *6 (S.D. Fla. Sept. 7, 2022), *R&R adopted*, No. 21-23604, 2022 WL 4310972 (S.D. Fla. Sept. 19, 2022) (holding that PPP loans do not trigger RA obligations), *with Beverly R. v. Mt. Carmel Acad. of New Orleans, Inc.*, 528 F. Supp. 3d 451, 461-62 (E.D. La. 2021) (holding the opposite).  To quote one district judge: "whether a PPP loan constitutes 'Federal financial assistance' for purposes of the Rehabilitation Act is not as straightforward as [each party] suggests."  *Sims v. Midway Broad. Corp.*, No. 22-03743, 2023 WL 6795702, at *3 (N.D. Ill. Oct. 13, 2023).

clear because here, the school had spent all the federal assistance prior to receiving the loan forgiveness.  ECF 45, Def. Reply Br. at 5 & Magee Suppl. Dec.  Plaintiff offers no theory explaining how Defendant could continue "accepting" its PPP loan after spending all the approved funds and subsequently receiving a letter of forgiveness.  The very authority on which Plaintiff relies to argue that PPP loans qualify as "Federal financial assistance" indicate that the RA would no longer apply when the government forgives the loan.  *See* U.S. Small Bus. Admin., *F.A.Q. Regarding Participation of Faith-Based Orgs. in the PPP and EIDL* at 5, ("Any legal obligations that you incur through your receipt of this loan are not permanent, and once the loan is paid or forgiven, these nondiscrimination obligations will no longer apply.")[4]; *Beverly R.*, 528 F. Supp. at 451 (remarking that a defendant "might not be required to comply with Rehabilitation Act obligations" after its PPP loan is forgiven); *see also Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n*, No. 20-3132, 2022 WL 2869041, at *5 n.11 (D. Md. July 21, 2022) ("Once an SBA loan is forgiven . . . a recipient is no longer subject to any legal obligations incur[red] through receipt of [the] loan.").

Public policy also supports such a result.  Federal programs offering financial assistance in an emergency exist to meet a need.  Eligible recipients should not be deterred from participating by a concern that acceptance of temporary assistance would permanently alter their legal status.

Factually, there is no dispute that the government forgave Defendant's PPP loan on July 2, 2021.  ECF 36, Ex. I, Notice of PPP Loan Forgiveness; Ex. E ("Zimmaro Decl."); Ex. F ("Magee Decl.").  Nor is there a dispute that after the PPP loan was forgiven, Defendant no longer received federal funding of any kind.  Zimmaro Decl.; Magee Decl.  To overcome that obstacle, Plaintiff seeks to reach back to the period before Defendant's PPP loan was forgiven, when his father, on

---

[4] Available at https://www.sba.gov/sites/default/files/2020-06/SBA%20Faith-Based%20FAQ%20Final-508.pdf [https://perma.cc/B9EE-2WG6].

one occasion in the 2020-2021 school year, purportedly asked the school's basketball coach if R.R.D. could play without a mask.  DiPietro Dep. at 121-22.  But Plaintiff and his father also acknowledged in their depositions that they had not yet consulted a doctor at that point and did not request any accommodation for a disability until long after this interaction with the coach.  DiPietro Dep. at 68-69, 115-17; R.R.D. Dep. at 34-37.  This is confirmed by the fact that R.R.D. continued to wear a mask at school for the duration of that school year.  R.R.D. Dep. at 35.

No reasonable jury could find an RA violation by the school based solely on a one-time informal request to a basketball coach to play without a mask, without medical corroboration and some assertion of a disability.  Thus, there is no legal basis on which the school could be liable under the RA.

**B.  ADA**

The ADA does not apply to "religious organizations or entities controlled by religious organizations."  42 U.S.C. § 12187; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 n.51 (2001) ("Congress expressly exempted . . . religious organizations or entities from Title III [of the ADA]'s coverage.").  Although the ADA does not define a "religious organization" or what it means to be "controlled by a religious organization," *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 482 (7th Cir. 2019), this exemption irrefutably applies to Archbishop Wood.

In deciding whether a corporation is a "religious organization," the Third Circuit has explained that "all significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious."  *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (citation omitted).  Nine factors frame the inquiry:

(1) Whether the entity operates for a profit;

(2) Whether it produces a secular product;

(3) Whether the entity's articles of incorporation or other pertinent documents state a religious purpose;

(4) Whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue;

(5) Whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees;

(6) Whether the entity holds itself out to the public as secular or sectarian;

(7) Whether the entity regularly includes prayer or other forms of worship in its activities;

(8) Whether it includes religious instruction in its curriculum, to the extent it is an educational institution; and

(9) Whether its membership is made up by coreligionists.

*Id.*

*Leboon* involved a Jewish community center. In deeming it to be a "religious organization," the Court placed significant weight on the defendant's non-profit status, its explicitly religious mission statements and open espousal of its religious beliefs, its close ties to local religious leaders, its financial support from other religious organizations, and its adherence to religious practices. *Id.* at 227-29. "These characteristics . . . taken together, clearly point[ed] to the conclusion that the [defendant] was primarily a religious organization." *Id.* at 229.

A similar analysis applies here. Archbishop Wood is a non-profit organization; it has an expressly religious mission and curriculum; it is supported and directly supervised by the Roman Catholic Archdiocese of Philadelphia; and it requires students to participate in religious instruction and prayer. Zimmaro Decl.; Magee Decl.; O'Grady Dep. at 11-13, 101, 135; R.R.D. Dep. at 23-24. Plaintiff acknowledges the school's religious features and offers no theory as to why it would not qualify for a religious exemption. I therefore find it beyond dispute that Defendant is a religious organization within the meaning of the ADA. *See Marshall v. Sisters of Holy Fam. of Nazareth*, 399 F. Supp. 2d 597, 605-07 (E.D. Pa. 2005) (holding that "Nazareth Academy is a religious organization or entity controlled by a religious organization" because of its Catholic

identity, curriculum, and operation by Catholic nuns); *Sky v. Haddonfield Friends Sch.*, No. 14-5730, 2016 WL 1260061, *8-11 (D.N.J. Mar. 31, 2016) (similar analysis of a Quaker school); 28 C.F.R. Pt. 36, App'x C ("[A] parochial school, having religious doctrine in its curriculum and sponsored by a religious order, could be exempt either as a religious organization or as an entity controlled by a religious organization, even if it has a lay board.").

Accordingly, I will dismiss Plaintiff's ADA claims in Counts II and III of the Amended Complaint.[5]

### C. Negligence

In Pennsylvania, a plaintiff must prove four elements to establish negligence: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. *Toro v. Fitness Int'l LLC*, 150 A.3d 968, 976-77 (Pa. Super. Ct. 2016).

Plaintiff claims that Defendant "owed [him] a duty to be protected from harassment, bullying and harm while within Defendant['s] custody and care," and that Defendant "breached this duty by segregating [him] from his peers and allowing him to be harassed and bullied by administrators, teachers and students." Pl. Summ. J. Br. at 13; Am. Compl. ¶¶ 88-89. Plaintiff further claims that "[i]f not for Defendants' breach of their duties . . . [he] would not have been subjected to harassment, bullying, harm and emotional distress while attending the School . . . [and] would not have been expelled." Pl. Summ. J. Br. at 13; Am. Compl. ¶¶ 88-89.

---

[5] Coverage under the ADA does not require federal financial assistance, and the Third Circuit has recognized that the ADA was intended to expand the scope of the RA. *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 115 (3d Cir. 2018) (explaining that "Congress designed the ADA to fit hand in glove with the RA" by "extending its reach beyond federally funded programs"). But that expansion does not create liability here because of the specific exemption for religious entities.

Plaintiff claims that Defendant breached its duty in four ways, alleging: (1) that school staff took no action to protect Plaintiff from ongoing bullying by another student in the cafeteria, leading to the fight for which Plaintiff was expelled; (2) that school staff required Plaintiff to remain six feet apart from classmates, which included sitting alone in either the front or back of his classrooms; (3) that teachers repeatedly inspected Plaintiff's student ID and questioned him about his mask exemption; and (4) that a teacher directed Plaintiff to sit at the back of the school auditorium, much farther than six feet away from other students.  Even accepting that Defendant had some duty to protect Plaintiff from bullying, harm, and harassment while at school, I conclude that no reasonable jury could find a breach of this duty based on the evidence.

First, Plaintiff points to threats and bullying by another student at his assigned lunch table – and their subsequent fight and expulsion – to establish the school's breach.  But there is no evidence that any school staff even knew about these issues between the two students until their fight.  Plaintiff repeatedly acknowledged in his deposition that he told no one at the school about the threats or bullying.  R.R.D. Dep. at 108-10, 146-49.  His father likewise admitted that he has no memory of making any related complaints or requests to the school.  DiPietro Dep. 47-50, 171-72.  Plaintiff apparently once asked his guidance counselor to change lunch periods, which could have conceivably alerted her to *an* issue, but he admits that he did not specify why he wanted the change and acknowledged that he could have readily moved seats on his own within the lunchroom.  R.R.D. Dep. at 108-10, 146-49, 215-16.  Principal O'Grady explained in her deposition that the school's general practice was not to change students' lunch periods without reason to do so, because students often made these requests to align their lunch break with friends.  O'Grady Dep. at 136-44.  There is simply no evidence that the school knew about the alleged bullying and acted negligently by failing to prevent it or intervene.  Nor is there evidence that

Plaintiff's accommodations played any role in the bullying, fight, or expulsion.   Plaintiff acknowledged that their dispute was not related to his mask exemption or social distancing requirements, and the school expelled Plaintiff for violating its fighting policy, just as they expelled the other student, who had no mask exemption.   R.R.D. Dep. at 142-45; Ex. D (school's final incident report); O'Grady Dep. at 111 (confirming that R.R.D. was the only student with a mask exemption).

Next, Plaintiff claims that the school acted negligently by requiring him to "socially distance" by at least six feet, and relatedly, by separating him at the back or front of his classrooms. But Plaintiff affirmatively requested that the school accommodate him through social distancing. The school granted this exemption and notified Plaintiff's teachers that he needed to sit at least six feet away from other students, which rationally required them to move his assigned seat to a more isolated space.   O'Grady Dep. at 55.   There is no evidence to suggest that any teacher acted unreasonably in carrying out Plaintiff's exemption.   Nor could a reasonable jury dispute that six feet of distance for an unmasked student was a reasonable imposition by the school – even while masked students maintained only three feet of distance.   Especially because (a) Plaintiff requested social distancing *in lieu of* masking, which intuitively meant maintaining a greater distance than that of masked students; (b) Plaintiff had the additional option of wearing a face shield that would allow him to maintain the same distance as masked students, R.R.D. Dep. at 43-44; (c) Plaintiff has provided no evidence that he ever asked the school to reassess his six feet requirement or desk placement, R.R.D. Dep. at 122-23; (d) all students in the school were required to remain six feet apart in the prior school year even while masked, highlighting that this distance was not excessive or unprecedented, O'Grady Dep. at 24-25; and (e) six feet of distance was generally accepted as a

reasonable distance for social distancing by federal and state public health officials throughout the pandemic, Ex. K (guidance to schools from the CDC & Pennsylvania Department of Health).

Plaintiff also describes repeated and forceful inquiry by teachers in the hallway about the sticker on his student ID denoting his mask exemption:

> A. [W]henever I would walk in the hallways . . . teachers would walk up to me, like -- and kind of like an aggressive walk and like grab my ID.  Because we had to wear [our] IDs around our neck, and it was [a] lanyard.  So teachers would come up and grab -- almost put their hands on my chest and they would grab my ID and check if I had that [mask exemption] sticker because I wasn't wearing a mask.
> . . . .
> Q. Now, who -- what teacher specifically?
>
> A. I honestly -- I don't know the teacher's names . . . . It would be the teachers that roam the halls, almost.  They are doing their job, but I mean, they are just hall monitoring, I guess, if they have a free period, or something like that.
> . . . .
> Q. So once they saw the [mask exemption] sticker, did they make you put your mask on anyway?  Or, you know, what happened?
>
> A. Oh, no, they would -- well, honestly, they would give me a bad look . . . . And sometimes they would question me.  They would ask me questions like . . . "Is Dr. Mangin aware of your exemption" and "do your teachers know," and stuff like that.

R.R.D. Dep. at 70-75.

Strict enforcement of public health protocols at a private school cannot be deemed negligence or harassment, even if Plaintiff perceived it as overly vigorous.  Teachers had the difficult task of enforcing the school's mask requirement as recommended by public health officials to protect their students.  And Principal O'Grady testified that – contrary to what Plaintiff believed – she did *not* notify all teachers of Plaintiff's mask exemption out of respect for Plaintiff's

privacy. O'Grady Dep. at 114-15.[6] Moreover, for the school to have breached some duty, it would need to be on notice of R.R.D.'s alleged harassment, and there is no evidence of ongoing complaints about the manner in which his masking exemption was monitored. *See* R.R.D. Dep. at 76-77; O'Grady Dep. at 102. The most the record contains is vague testimony from Mr. DiPietro that he persistently communicated to the principal that he knew what was best for his son.

Lastly, Plaintiff complained that a teacher made him sit in the last row of the auditorium – much farther than six feet away from others – on two or three occasions. R.R.D. Dep. at 95. No reasonable jury could find that this teacher's choice of where to seat Plaintiff constituted a breach of a duty by the school. Plaintiff affirmatively asked for social distancing instead of masking, and his teachers were directed accordingly to seat him six feet away from others, at a minimum. These teachers had to balance Plaintiff's desire not to be excessively distanced with the need to protect others from a deadly pandemic, especially immunocompromised students, and staff. Further, Principal O'Grady explained in her deposition that in each of these instances, students were spread throughout the auditorium to study independently, not all congregated at the front. O'Grady Dep. at 122-24. As a high school sophomore, R.R.D.'s frustration with his isolation was certainly understandable, but the teacher's exercise of discretion in weighing how to protect the safety of all students while honoring Plaintiff's exemption request cannot be deemed negligence.

In sum, there is no factual basis on which a reasonable jury could conclude that Defendant acted negligently by breaching a duty to protect R.R.D. from harassment, bullying, or harm.

---

[6] Plaintiff emphasizes one specific encounter with a teacher who allegedly got uncomfortably close to Plaintiff's face to confront him about not wearing a mask. The undisputed evidence is that this incident occurred during the previous school year, before Plaintiff had requested an exemption, meaning Plaintiff was in violation of school rules. O'Grady Dep. at 112-14; R.R.D. Dep. at 85-86, 200. An instance of excessively zealous enforcement of school policy does not, by itself, support the recovery of damages against a school for failure to protect against harassment.

**IV.    Conclusion**

      For the reasons set forth above, Defendant's motion for summary judgment will be granted, Plaintiff's motion for summary judgment will be denied, and Plaintiff's claims will be dismissed. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge
